MEMORANDUM OF DECISION RE: TERMINATION OF PARENTAL RIGHTS PETITION
I. INTRODUCTION
This case arises out of a petition filed with this court on January 19, 2000, by the department of children and families (hereinafter referred to as the "petitioner" or "department") whereby the department seeks the termination of the parental rights of Louise C. and Joseph P. to their now five and one-half year old daughter, Breanna and their now four year old son, Joshua.[3]
Prior to the commencement of trial, Louise C. executed an affidavit consenting to the termination of her parental rights which, after a full canvass in the presence of her attorney, resulted in a finding by this court that said consent was knowingly and voluntarily made and was a valid ground for the termination of her parental rights. A finding that termination of her parental rights was in the best interest of each child was deferred pending the decision as to Joseph P. Mother did not participate in the trial of the petition as against father.[4]
II. HISTORY OF PROCEEDINGS
CT Page 3619
Court proceedings originated on August 18, 1998, when the department filed a petition against Louise C. and the respondent alleging that Breanna and Joshua were neglected children in that they were being denied proper care and attention physically, emotionally or morally and that they were being permitted to live under conditions, circumstances or associations injurious to their well-being.[5] General Statutes §46b-120 (9)(B) and (C). On the day that petition was filed, an order of temporary custody was issued by the court (Swienton, J.) which was confirmed on August 25, 1998 (Brenneman, J.). Breanna and Joshua were committed to the care and custody of the department on July 28, 1999, by this court. Said commitments were extended on June 20, 2000, (Brenneman,J.) and are due to expire on July 28, 2001.
Trial of the termination petition commenced on July 14, 2000, and continued on four additional trial days, concluding on August 21, 2000, with an interim order entered by this court, which suspended all visitation between respondent and his children, pending the issuance of this decision.[6] A briefing schedule was ordered after the conclusion of final argument on August 30, 2000; the final memorandum of law was filed with the court on November 15, 2000.
The court finds that mother and father have appeared and have court-appointed attorneys, as does the child. The court has jurisdiction in this matter. There is no proceeding pending elsewhere affecting the custody of Breanna or Joshua. Although Louise C. has consented to the termination of her parental rights as to both children, the respondent remains steadfastly opposed to the termination of his parental rights. The petitioner has proceeded against the respondent on two of the statutory grounds provided in General Statutes § 17a-112 (c).[7]
The petitioner alleges that the children have been found in a prior proceeding to have been neglected and the respondent has failed to achieve such a degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the children, the respondent could assume a responsible position in the life of said children. General Statutes § 17a-112 (c)(3)(B)(1). Additionally, the petitioner alleges that there is no on-going parent-child relationship with respect to the respondent that ordinarily develops as a result of a parent having met on a continuing, day to day basis, the physical, emotional, moral or educational needs of the children and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the children. See General Statutes § 17a-112
(c)(3)(D).
During the trial the court heard testimony from an evaluating clinical CT Page 3620 psychologist, a clinical social worker, a hospital clinician, two family therapists, two department case workers, the children's foster mother, the brother of Louise C. and the respondent. The court, after reading the petition and accompanying statement of facts, reviewing the twenty-five documentary exhibits admitted into evidence, taking judicial notice of respondent's steps dated July 28, 1999, and the transcript of the proceedings of this court on September 29, 1999, considering the testimony of all witnesses and reviewing the memoranda submitted by counsel, does make the following findings.
III. FACTS
In August, 1998, when the neglect petition was filed by petitioner, the respondent was not residing with Louise C. The respondent testified that he had been living separately from the mother of Breanna and Joshua since February, 1998, however, significant documentary evidence indicates the period of separation occurred much earlier. In fact, mother reported to the department caseworker that the separation commenced in October, 1997, with the issuance of a protective order. Mother also reported that prior to that time, their residential relationship was very tenuous in that the respondent would leave her residence for a period of a month or longer and would visit the children for a couple of days at a time. Mother's brother testified that the respondent and his sister "separated" shortly after the birth of Joshua (November 1996) and later stated that the respondent and mother were not residing together at the time of Breanna's birth (July 1995). Both the respondent and mother's brother testified that whatever the residential relationship between mother and the respondent may have been, the respondent visited with the children as often as every other day. Such visits at the residence of the children, the respondent admitted, violated then existing protective orders, the latest having been issued six months prior to the removal of the children by the department.
The children were removed from mother's care due to a history of domestic violence, alcohol abuse by both mother and the respondent, deplorable living conditions, inappropriate caretakers and inadequate medical care for the children. In addition, the department confirmed cocaine use by mother. The respondent had a substantial history of alcohol abuse and was arrested within a month of the children's removal for operating under the influence of alcohol. Mother admitted to department caseworkers that she and the respondent were heavy drinkers.
All aspects of the various issues raised by the parties relative to the respondent's visitation with his children subsequent to their removal by the department will be discussed at length later in this memorandum. It is noteworthy, however, that supervised visits between the respondent and CT Page 3621 his children commenced within a week of their removal; however, all visits were suspended by the department in late fall, 1998, due to the respondent's behavior and demeanor during the visits and the respondent's initiation and pursuance of contact with the then foster parents of the children. The department wished to await the results of a court-ordered psychiatric evaluation by James Merikangas, M.D. and a psychological evaluation by Dr. Anne Phillips in order to determine whether visitation was to be reinstated.
Merikangas, whose specialty is neuro-psychiatry, did not testify during the trial, however, his evaluation of the respondent dated January 22, 1999, was admitted into evidence (State's Exhibit #10) as well as a follow-up report dated 4-20-99. (State's Exhibit #11.) Merikangas found the respondent to be rather "grandiose" in his presentment claiming that he owned substantial real estate, was an inventor possessing several patents, owned a tractor-trailer company and had raised several children who now, as adults, enjoy successful careers, including a daughter who, the respondent claimed, was a federal judge. When the evaluator attempted to obtain more details concerning his children and his past, the respondent's recollection of past events deteriorated significantly. Merikangas concluded his examination and report with a differential diagnosis of manic depression, organic personality disorder and a form of psychosis, adding that the respondent might well suffer from all three disorders. In his follow-up report Merikangas prescribed Tegretol for mood stabilization and Risperdal to combat the psychosis. Merikangas, noting that alcohol abuse was a major problem in the respondent's life, opined that his abstinence from alcohol was essential to the success of any treatment.
Phillips conducted her first of two evaluations of the respondent and each of the children, including observation of the respondent interacting with his children in January, 1999. In her report filed on March 23, 1999, Phillips concluded that both children suffered from developmental delays in speech and cognition and appeared to be markedly lacking in curiosity and energy for engagement. She feared that both were at great risk of being unable to attach to anyone. In observing the children with the respondent, Phillips was concerned as Breanna was unresponsive to the respondent's directions, while Joshua appeared oblivious to people in the room, including the respondent. Phillips concluded that although the respondent presented as fond of his children and was attentive, kind and full of praise, he was unaware of their emotional and developmental issues. Commenting that the respondent, who was then sixty years of age, suffered from a back injury and noting his past heart attack and stroke, Phillips concluded, as to the respondent's parenting abilities:
 He evidences emotional and medical issues of his own CT Page 3622 which seem to interfere both with his energy for parenting and his ability to regard problems realistically and non-defensively. He has difficulty establishing boundaries between his hopes and resentments and those of the children and seems vulnerable to using the relationship to the children as a vehicle for addressing his own needs for recognition and attention rather than theirs. Mr. P does not seem at all aware of the developmental needs of the children, much less their significant needs for consistent stimulation, limit setting and nurturance, as well as a likely need for professional intervention with developmental and cognitive issues. He does not seem a likely appropriate primary caretaker for these young children.
(Emphasis added.) (State's Exhibit #3.)
In a letter dated May 14, 1999, Phillips offered her opinion as to visitation, recommending that the respondent have no visitation with his children until he completed a parenting education program to better understand "the norms and strategies for engaging and interacting with young children." (State's Exhibit #5.) Once such a program was completed by the respondent, supervised visitation every other week was acceptable to Phillips. Phillips cautioned, however, that the respondent should refrain from denigrating the children's caregivers and should cease enticing the children into inappropriate activities. During the interviews with Phillips, the respondent had consistently made disparaging remarks about the department caseworker and the foster parents in the presence of the children.
At the time of the children's commitment to the department, this court issued specific steps to the respondent as mandated by General Statutes § 46b-129 (j). The purpose of the steps is to facilitate the return of the children to the parent or parents. Just above the area containing the respondent's signature dated July 18, 1999, the following statement appears:
 I acknowledge that failure to achieve these specific steps will increase the chance that a petition may be filed to terminate my parental rights permanently so that my child may be placed in adoption. I understand that I should contact my lawyer and/or DCF worker if I need help in reaching any of these steps.
Among the steps the respondent needed to accomplish were his CT Page 3623 participation in a parenting education program, individual counseling while making progress toward identified treatment goals, successful completion of substance abuse treatment and compliance with aftercare treatment. The respondent was to follow the recommendations of service providers, specifically the psychologist and psychiatrist, and was to demonstrate proper parenting skills. In addition, the following was specifically ordered:
 "Joe P. [respondent] [is] to engage in counseling with a psychiatrist in consult with a treating psychiatrist to assure that all treatment needs are met".
From November, 1998, through April, 1999, the respondent attended thirty-four sessions of parenting classes at the McCall Foundation. He was referred by the department caseworker, Mr. Shick. He completed four separate parenting programs. During his intake evaluation, he admitted to the therapist that he did not discipline his minor children and that his parenting philosophy was to "love `em up." (State's Exhibit #14.) He admitted also that he did a lot of damage to his relationship with his minor son and daughter by his excessive use of alcohol. Despite those admissions, that he said he rated a nine on a scale of parenting skills from one to ten. He repeatedly told department caseworkers that having raised children who are now successful adults, he needed no parenting training and knew how to parent his children. Contrary to the recommendations of the department, he stopped attending the classes in April, 1999 at McCall; however, he did participate in six sessions of a basic parenting course in September, 1999 at the Waterbury Youth Services. He had moved from Torrington to Waterbury in the spring of 1999.
Despite the respondent's attendance at the classes, the coordinator at McCall concluded that he had not demonstrated knowledge of the parenting techniques discussed in class and had not shown an understanding of the emotional and developmental needs of his minor children. Although he often verbalized his love for them, the coordinator was skeptical as to the respondent's ability to meet said children's needs, adding that the respondent's overall lack of insight was "most concerning." (State's Exhibit #14.)
In November, 1998, the respondent was evaluated for his alcohol abuse at the McCall Foundation, again, at the behest of the department caseworker. He told the intake evaluator that he had abused alcohol "because of my girlfriend," referring to mother. The evaluator found him to be in substantial denial as to the impact his alcohol abuse had upon him and his children. An extensive three-prong substance abuse program was recommended: partial hospitalization, individual counseling and a CT Page 3624 sobriety group. The respondent participated in the partial hospitalization program from November 23, 1998, to December 29, 1998; engaged in individual counseling from January 21, 1999, to April 22, 1999; and he attended the meetings of the sobriety group from April 29, 1999, to July 8, 1999. He abruptly, without notice or explanation, ceased participation in the substance abuse program in early July, 1999, and did not return the phone calls initiated by his therapist. (State's Exhibit #16.)
The McCall therapist was concerned as to the respondent's ability to maintain sobriety as his sole motivation for doing so, understandable as it may be, was the return of Breanna and Joshua rather than for the sake of his own health and well-being. In fact, the respondent warned his therapist on June 13, 1999, that if he did not get his children back, he would not remain sober.
The respondent disconnected from the McCall program during the summer of 1999 because he had purchased a house in Waterbury which required painting, roofing and other significant repairs, all of which were ordered by the mortgagee and which, the respondent asserted, occupied most of that summer. Respondent did, however, with the case worker's persistence, enroll in two outpatient alcohol abuse groups through the Morris Foundation in Waterbury. Although his initial participation was delayed nearly a month after his evaluation, the respondent did consistently attend the groups from September 24, 1999, to December 13, 1999, and completed the initial intensive treatment. (State's Exhibit #17.) The respondent told his therapist that he used to drink two pints of whiskey a day, yet denied that he was an alcoholic. He admitted that domestic violence and alcohol played a major role in his relationship with mother, yet minimized the consequences of both. Again, he informed the therapist that his sole motivation for engaging in treatment was the return of his children. Treatment personnel at the Morris Foundation recommended that the respondent participate in a long term recovery and aftercare program, however, further referrals were not made due to the respondent's psychiatric issues evidenced by delusional tendencies similar to those noted by Merikangas. Psychiatric evaluation and treatment was strongly recommended.
Psychiatric treatment for the respondent was not only a concern of the Morris Foundation, such treatment, as previously noted, was mandated by the specific steps issued by this court on July 28, 1999. Three months after that court order, the respondent did participate in an intake evaluation at the Waterbury Hospital Behavioral Health Crisis Center which was arranged by the department. The respondent, however, informed the evaluator, Mr. O'Brien, that he didn't need any treatment and that he didn't want any treatment. The department caseworker had neither informed CT Page 3625 O'Brien of the pendency of the child protection case nor of the issuance of the court-ordered steps. The respondent, likewise, made no mention of those circumstances. Although O'Brien detected no high risk behaviors and had no concerns that the respondent was a risk to himself or others, the tests administered had no relationship to the issue of proper parenting by the respondent. No treatment modality was recommended by O'Brien because the respondent's cooperation was an essential first step. The department caseworker, Mr. Shick, did disclose all the relevant circumstances to O'Brien several days after the evaluation; however, the respondent persisted in his refusal to pursue any mental health therapy until March, 2000, two months after the present petition was filed.
The court-ordered steps also provided that the department was to facilitate supervised visits of the children with the respondent "every other week." The inclusion of the visitation language in the steps was agreed to by all parties despite Phillips concern that visitation with respondent was "likely to confuse both children and contribute to their already existing difficulty with attachment and interpersonal trust." (State's Exhibit #5.) Visitation was agreed to and ordered despite a letter from the parent coordinator at the McCall Foundation, solicited by the respondent's attorney, which recommended no visitation between the respondent and either child. (State's Exhibit #14.) Presumably, the supervised bi-weekly visitation was agreed to because the respondent had participated in the parenting and substance abuse programs previously described.
Visitation, as ordered, did take place nearly every two weeks from August to December, 1999. As clearly demonstrated by the department's visitation log, which detailed parent-child interactions during visits from August 2, 1999, to December 6, 1999, the visits were characterized by Breanna's out of control behavior, Joshua's withdrawal and the respondent's complete inability to properly parent his children. (State's Exhibit #18.) Breanna would hit her brother who would then hit back; she would throw food and spill drinks; and she would climb tables and chairs and throw toys at the wall and at Joshua. Invariably, the respondent would not only fail to correct or appropriately discipline his daughter for her behavior, he would smile and giggle which only served to escalate the bad behavior. The respondent initiated few interactions with Joshua, who when not being assaulted by his sister, would usually play quietly by himself. The respondent failed to set any limits to Breanna's behavior and would fail to interrupt or correct the children when they hit each other. When the above-described parental deficiencies were pointed out to respondent by department personnel, he dismissed the criticism insisting that he was there to enjoy his children, not to discipline them and that he always fought with his siblings when he was a child. He would remind the visitation supervisor that he raised eight children who are CT Page 3626 successful adults and needed no instructions as to the proper parenting of his two minor children.
In light of the visitation experience described above, and due to major disruptive behavior by Breanna in her foster home post visitation, the department reduced the visits to once per month in December, 1999.[8]
The bi-weekly visitation schedule was re-implemented in June, 2000, while an administrative hearing on the issue was pending, by a successor department caseworker who rediscovered the inclusion of the visitation in the court-ordered steps. As noted, two months later at the conclusion of the trial on the present petition, this court suspended all visitation between the respondent and his minor children pending this decision.
The evidence clearly establishes that each of the respondent's minor children have very special needs that must be understood and tended to by their caregivers. Breanna has been diagnosed with reactive attachment disorder and attention deficit hyperactivity disorder. According to Peggy Sudol, owner of and licensed family therapist at Thomaston Counseling, Breanna is not trusting of adults due to insufficient bonding. She, therefore tantrums when she doesn't get her way and engages in other disruptive behavior at home and at pre-school. Breanna's foster mother, who has been a developmental therapist and is currently a special education teacher, stated that Breanna's tantrums include yelling, screaming and kicking walls. Breanna was compelled to undergo the removal of four teeth and faces at her tender age, future invasive dental procedures due to severe tooth decay caused by bottle rot. The respondent admitted that he used "to pop bottles in the kids mouths to keep them quiet." Phillips, after her observation of the respondent with Breanna noted that the respondent's failure to redirect his daughter's misbehavior caused her to act up more. The foster mother testified at length as to the substantial increase in Breanna's tantruming behaviors after visits with the respondent. She and her husband, a behavioral specialist by profession, charted Breanna's post visitation tantrums, disruptive and aggressive behaviors which corroborated the foster mother's testimony (State's Exhibit #13.) The respondent sees Breanna's misbehavior as "normal" and offers as a solution to her acting up a large back yard for her amusement.
Joshua has recently completed the Birth to Three Program for which he qualified due to developmental delays in speech and language. Joshua, according to Sudol and the foster mother is a child who is very passive and very much in his own world. He is very withdrawn and prefers to play alone. He also evidences many cavities due to bottle rot. Appropriate caretaking for Joshua should be purposed to draw him out of his shell.
Phillips observed that the respondent, despite the tooth decay CT Page 3627 affecting both children, continued to feed them sweets and snacks. The respondent's brother-in-law stated that he had seen the respondent feeding the children cookies and doughnuts and "some meals."
Both children have been in foster care since August, 1998, and both have resided with their current foster parents since March, 1999. During the past two years, the foster parents have engaged Sudol's services so that they may learn to understand the special needs of each of the children and learn the appropriate parenting response to those needs. According to Sudol, Breanna has attached emotionally to her foster parents and now expresses love for them. According to the foster mother, Joshua is emerging from his shell and is beginning to engage and enjoy his classmates and others. He now talks constantly and is well-liked at pre-school.
IV. ADJUDICATION
For the purposes of adjudication, the court's inquiry is limited to those events which preceded the filing of the present petition. Practice Book § 33-3. The adjudicatory date is, therefore, January 19, 2000. The disposition date is the date that the trial concluded and the decision was reserved, i.e., August 30, 2000.
A. REASONABLE EFFORTS
Prior to the court's consideration of the statutory grounds alleged by petitioner to provide the basis for the termination of the respondent's parental rights and prior to consideration as to whether such termination is in the best interest of his two minor children, this court must consider the "reasonable efforts" findings required by § 17a-112 (c) (1). That section provides that in order for the court to grant the termination petition, it must find by clear and convincing evidence that the department has made reasonable efforts to locate the parent and to reunify the child or children with the parent. In lieu of that finding the court may find, by clear and convincing evidence, that the parent is unable or unwilling to benefit from reunification efforts.
In the termination petition, the department alleges that it has made reasonable efforts to reunify both Breanna and Joshua with the respondent, but the respondent is unable or unwilling to benefit from such efforts. The Appellate Court has referred to the word "reasonable" in this statutory context as the "linchpin" in adjudging the efforts by the department under the circumstances of the particular case. The court has stated that the department's obligation hereunder is to do everything reasonable and that the department is not expected to do everything possible. In re Rachel M., 58 Conn. App. 448, 450 (2000); In re Eden F.,
CT Page 362848 Conn. App. 290, 311-312 (1998), rev'd on other grounds, 250 Conn. 674
(1999).
The department offers as evidence of its efforts to reunite the respondent and his minor children its procurement of the following services: psychological evaluations, including interactionals with the children (Dr. Phillips); neuro-psychiatric evaluation (Dr. Merikangas); parenting classes (The McCall Foundation and Family Services of Greater Waterbury); substance abuse evaluation and treatment (McCall and Morris Foundations); mental health evaluation (Waterbury Hospital); and supervised visitation with the children. The department asserts, however, that despite dedicated participation in some of the services and intermittent participation in others for a period of eighteen months prior to the filing of the present petition, the respondent was and currently is unable to demonstrate any ability to provide appropriate care for Breanna and Joshua. The department also asserts that respondent's refusal to recognize the need for treatment of his mental disorders is a major impediment to his ability to understand and appropriately provide for the special needs of his children. As noted earlier, without obtaining the requisite mental health care, the respondent's re-engagement with his alcohol abuse program is not possible, thus further impacting adversely on his ability to provide proper parenting for these two young children. As proof of the respondent's inability to properly parent his children, the department points to the visitation log, previously referred to herein. The respondent refuses to take constructive criticism or appropriate direction regarding the children's behavior during the visits. His refusal to correct, redirect or discipline the children for out-of-control behavior simply escalates the situation so that the disruptive behavior, particularly that of Breanna, continues long after the visitation has ended.
The respondent argues that the department's failure, for a period of six months, to strictly adhere to the court-ordered bi-weekly visitation unreasonably deprived him of many hours of visitation with his children. This court does believe that the department's failure to recall the court order relative to visitation was an oversight — no one else, including the respondent and his attorney recalled the order. Moreover this court does not find that the respondent's relationship with his children was diminished in any respect. The respondent's problems concerning visitation were not due to further separation from his children but resulted from his inability to recognize and deal with his own problems of substance abuse and mental health and his inability to learn how to properly parent his children. In re Steven N.,57 Conn. App. 629, 634 (2000). CT Page 3629
This court finds, after consideration of all of the relevant evidence, that the department has made reasonable efforts to reunite the respondent with Breanna and Joshua and that the respondent is unwilling and unable to benefit from said efforts.
B. THE MENTAL HEALTH ISSUE AND THE AMERICANS WITH DISABILITIES ACT
Although the respondent has repeatedly denied that he has any mental health issues, at oral argument the respondent for the first time claimed that in its failure to deliver services appropriate to the respondent's mental health needs, the department violated The Americans with Disabilities Act, hereinafter referred to as the "ADA".[9]
In the case of In re Jessica S., 51 Conn. App. 667, cert. denied,251 Conn. 901 (1999), the Appellate Court considered whether a mother's mental illness was a defense to the allegation in a petition to terminate her parental rights. The mother argued that her mental illness prevented her from achieving the level of rehabilitation required by the termination statute and that termination of her parental rights would violate article XXI of the Constitution of Connecticut.[10] The court found no such violation noting that § 17a-112 makes no distinction between mentally ill and other persons. Id., 673. Citing In re NicolinaT., 9 Conn. App. 598, 606, cert. denied, 203 Conn. 804 (1987), the court found that the trial court acted properly in terminating the mother's parental rights which was done not because of her mental condition, but because of her inability to function as a parent. Id., 673-74. The court, again, recognized termination as being in a child's best interest when a parent's mental deficiency or illness prevents said parent from providing a child with proper care. In re Nicolina T., supra, 605.
In the case of In re Anthony B., 54 Conn. App. 463 (1999), the Appellate Court was asked to decide whether the ADA was applicable to termination of parental rights proceedings. The court held that the ADA neither provides a defense to nor creates special obligations in a termination proceeding and that a termination proceeding was not a service, program or activity under the act. The court stated:
 Our Supreme Court has held that a parent's rights can be terminated because of her mental condition, even if she is not at fault. "In weighing the interests of the child against the hardship imposed on the parent, the legislature may properly strike the balance at the point where the mental or physical deficiency, even though not involving fault, is so great as to render the parent incapable of measuring up to the child's needs as those are delineated in [§ 17a-112 (c)]." CT Page 3630 . . . Termination has been consistently recognized as being in the best interest of the child when the parent has a mental deficiency or illness which renders her unable to provide the child with necessary care.
(Citations omitted; internal quotation marks omitted.) Id., 473.
The respondent asserts that the ADA requires meaningful access to benefits and services by public agencies receiving federal funds, the department being one of those agencies. He then claims that the department failed to provide parenting or other programs fashioned to meet the respondent's needs and that said failure violated the ADA. Hence, the petition should be denied or dismissed. The respondent, however, does not cite one case, from this state or any other, nor does he cite any federal case wherein a termination of parental rights petition was denied or dismissed due to a violation of the ADA. The respondent boldly asserts, without more, that the department violated the act and that the alleged violation requires this court to make the giant leap to deny the petition. The court is not inclined to rule on issues which have been belatedly raised and improperly briefed. Moreover, the respondent has failed to point to any available "service, program or activity" which was denied him. In so far as issues pertaining to his mental health are concerned, the respondent refused to recognize that he had any mental health needs and declined mental health treatment. In so far as his parenting classes are concerned, despite many hours of classroom instruction, the respondent has little or no understanding of the special needs of Breanna and Joshua and has failed or refused to apply the parenting techniques presented in class or offered during visitation by department personnel. Until his testimony at trial, the respondent continued to offer his alleged successful parenting of his adult children as proof of his parenting ability while providing no specific information about those children, their location or their relationship with him. As the children's attorney points out in his brief, the respondent claims that the department made no effort to modify programs or to seek alternatives, yet fails to identify what services could have been offered . . . to one who denied, until trial, that he needed any services! There is no factual or legal basis to support a finding that the department has in any manner violated the ADA in this case.
C. RESPONDENT'S ALLEGED FAILURE TO REHABILITATE
As indicated the petitioner alleges that pursuant to § 17a-112 (c) (3)(B)(1) the respondent has failed to achieve the level of rehabilitation necessary to be a responsible parent to his two minor CT Page 3631 children. Before this court reaches the issue of whether termination of the respondent's parental rights is in the best interest of said children, the petitioner must prove by clear and convincing evidence one of the two statutory grounds alleged.
In the case of In re Eden F., 250 Conn. 674, 706, rehearing denied,251 Conn. 924 (1999), our Supreme Court defined "rehabilitation" as follows:
 `Personal rehabilitation' as used in the statute refers to the restoration of a parent to his or her former constructive and useful role as a parent. . . . [Section 17a-112] requires the trial court to analyze the [parent's] rehabilitative status as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable "within a reasonable time. `Rehabilitate' means to restore [a handicapped or delinquent person] to a useful and constructive place in society through social rehabilitation. . . . The statute does not require [a parent] to prove precisely when she will be able to assume a responsible position in her child's life. Nor does it require her to prove that she will be able to assume full responsibility for her child, unaided by available support systems. It requires the court to find by clear and convincing evidence, that the level of rehabilitation she has achieved, if any, falls short of that which would reasonably encourage a belief that at some future date she can assume a responsible position in her child's life.
(Citations omitted; internal quotation marks omitted.)
In assessing rehabilitation the issue is not whether the parent has improved [his] ability to manage [his] own life but whether [he] has sufficiently achieved the ability to meet the particular needs of his children. In re Shyliesh H., 56 Conn. App. 167, 180 (1999). The court must review the past and present status of the respondent's children and view the respondent's parenting abilities from a historical perspective. See In re Tabitha P., 39 Conn. App. 353, 361 (1995). The inquiry is not whether the respondent is able to meet the needs of children of normal development, but whether he is now or may in the foreseeable future be able to meet the particular needs of Breanna and Joshua. In re Luis C.,210 Conn. 157, 167 (1989); In re Samantha B., 45 Conn. Sup. 468, 477
(1997), aff'd, 51 Conn. App. 376 (1998), cert. denied, 248 Conn. 902
(1999). The respondent's personal rehabilitation is to be determined, in CT Page 3632 part, by the extent to which he complied with the specific steps issued by this court. See In re Shyliesh, supra, 56 Conn. App. 179. "In the adjudicatory phase, the court may rely on events occurring after the date of the filing of the petition to terminate parental rights when considering the issue of whether the degree of rehabilitation is sufficient to foresee that the parent may resume a useful role in the child's life within a reasonable time." (Emphasis in original.) In reStanley D., 61 Conn. App. 224, 230 (2000).
Extensive and credible evidence confirms that the respondent was at no time in the lives of Breanna and Joshua a custodial parent on a continual basis. His relationship with Louise C. as the mother of said children was characterized by domestic violence, alcohol abuse and separation — separation either compelled by protective orders or initiated by the respondent who, according to her, would leave for months at a time. The respondent refuses to acknowledge his contribution to the problems plaguing his two minor children — lack of bonding, relationship issues, developmental delays, decayed teeth, and Breanna's tantrums. His relationship with his minor children, by his own admission, consisted of playing ball, horsey and teasing. The respondent also added that he put them to bed and changed their diapers, although the visitation logs of November 8, 1999, and November 22, 1999, indicated his lack of expertise in diaper-changing. (State's Exhibit #18.) He told Phillips that he had a close relationship with his adult children but rarely saw them, while he told his current therapist that he had no relationship with said children. The respondent's brother-in-law testified as to his observations of the respondent's parenting of Breanna and Joshua which consisted of feeding them cookies and doughnuts and "letting them run around, a lot. The respondent admits that when Breanna was with him", she had her way no matter what."
One has only to read the logs of the respondent's visits between August and December, 1999, as confirmation that there has been no change or improvement in his ability to properly parent these children. Despite attending some thirty-four parenting sessions, his parenting style has not changed one iota. He has not applied any knowledge gained from those sessions and he has consistently refused any suggestions made by department personnel. The respondent's lack of supervision, inappropriate behavior in directing the children, and inability to identify their needs and react accordingly result in mischief and mayhem during a one hour visit. Despite those visits being conducted in a structured setting for over a year, the respondent has not shown any improvement in his parenting ability or in his knowledge of the basic and special needs of his minor children. See In re Ashley S., 61 Conn. App. 658, 666 (2001). The respondent has also, along the way failed to recognize and address his mental deficiencies, which certainly had an adverse impact on his CT Page 3633 parenting abilities, despite a court order to do so as one of his specific steps.
Phillips had the opportunity to assess the respondent's parenting abilities one year after her initial evaluation. She testified that the respondent had exhibited no greater insight as to his children's needs and no improvement in his ability to set limits. He remained totally indulgent of Breanna's antics and initiated no play with Joshua. She opined that the respondent's parenting philosophy was "well-entrenched" and stated her belief that any counseling would be "too little, too late." She concluded that, in her professional opinion, the respondent could not provide proper parenting "now or in the future." Phillips' testimony confirmed the conclusions reached in her written report:
 Mr. P continues to assert a capacity for parenting which appears based more on his idealization of his past and present experiences than on a realistic appraisal of the needs of his small children and his own physical and emotional strengths and weaknesses. Although emotionally attached to the children, Mr. P does not evidence an appreciation of the significant delays and needs of these children and is unlikely to be able to address those needs or to cooperate with professionals attempting to work with them. Continued attempts to rehabilitate Mr. P and reunite him with the children are not in their best interest. (State's Exhibit #4.).
"The psychological testimony from professionals is rightly accorded great weight in termination proceedings." In re Nicolina T., supra,9 Conn. App. 605.
Ms. Oberman, a therapist engaged by the respondent in March, 2000, after prompting by the current department caseworker, Ms. Beaman, conducted, thirteen sessions with the respondent up to the date of trial. She expressed concern as to the respondent's ability to handle Breanna and Joshua, and concern that he had no contact with his adult children. In June, 2000, Oberman informed the caseworker that she was unable to assist the respondent as he continued to deny any need for therapy.
Beaman observed several visits between the respondent and the children from the time she took over the case in January, 2000. Beaman testified as to the respondent's failure to set limits and inability to show attention to both of the children at the same time. He permitted the children to fight at every visit without intervention and has no CT Page 3634 comprehension as to what his children need in terms of parenting.
During his testimony at the trial, the respondent, for the first time, offered to cooperate with request to individual counseling and expressed a willingness to learn more about parenting his two minor children. As Phillips put it, the offer is "too little, too late." Breanna and Joshua have been in their current placement since March 13, 1999. They identify their foster parents as their psychological parents. Permanency for them is long overdue. This court finds that petitioner has proven by clear and convincing evidence that the respondent has failed to achieve the requisite personal rehabilitation as would encourage the belief that within a reasonable time, considering the ages and needs of Breanna and Joshua, he could assume a responsible position in their lives.
D. NO ON-GOING PARENT-CHILD RELATIONSHIP?
Petitioner alleges, as a second statutory ground for the termination of the respondent's parental rights, that there is no on-going parent-child relationship between the respondent and his two minor children and to allow further time for him to establish such relationship would be detrimental to the children's best interest. General Statutes § 17a-112
(c)(3)(D).
In the case of In re Kezia M., 33 Conn. App. 12, 20-23, cert. denied,228 Conn. 915 (1993), the Appellate Court provides an excellent analysis as to the legal basis upon which a trial court must base its findings under this statutory provision. The court must undertake a two-pronged analysis, first, to determine whether there is any parent-child relationship and if none, second, whether it would be detrimental to the best interest of the children to allow time for such a relationship to develop. The first prong contemplates a situation in which a child either has never known the parent and, therefore, never developed a relationship or a relationship, once extant, has been displaced. In considering whether an on-going parent-child relationship exists, the feelings of the child are of paramount importance. See In re Jessica M., 217 Conn. 459,468 (1991). An on-going parent-child relationship, per the statute "ordinarily develops as a result of a parent having met on a day to daybasis the physical, emotional, moral and educational needs of the child". . . . (Emphasis added.) General Statutes § 17a-112 (c)(3) (D).
The respondent has never met on a continuing day-to-day basis the physical and emotional needs of Breanna and Joshua. His contact with them was intermittent. He was gone for weeks at a time and would then, according to mother return for a couple of days, at which time he would be more of a playmate than a father, allowing Breanna to run wild and do CT Page 3635 as she pleased and allowing Joshua to remain in his shell by not engaging him in activity. He complained to the parent coordinator at The McCall Foundation that Louise C., prior to department involvement, had allegedly left the children alone for a period of four days and the children were discovered by a maternal uncle hungry and diaperless. Where wasrespondent?
Sudol testified that Breanna knows "to some extent" that the respondent is her father; Joshua does not understand or view the relationship as that of a parent and child. Philips noted that Breanna was unresponsive to the respondent, while Joshua was oblivious to him. Breanna looks to "Joe-daddy", as she refers to him, for gifts, snacks, entertainment and justification for her misbehavior. According to Phillips, Breanna has no memory of a relationship with the respondent before removal. Phillips saw the relationship as one between Breanna and "a kindly grandfather", not one between a parent and his child. Phillips saw no relationship between Joshua and the respondent, stating that the child does not look to the respondent for connection, interaction, stimulation or nuturance.
The foster mother testified that neither child mentions the respondent when they are not in his presence, including the times when Breanna is tantruming. Beaman added that neither child looks to the respondent for direction or comfort. This court finds that there is no on-going parent-child relationship between the respondent and his two minor children, as that phrase is used in the statute and interpreted by the courts of this state.
In order to satisfy the second prong under the statute, the court is required to determine whether the allowance of further time to establish a parent-child relationship would be detrimental to the children's best interest. The Supreme Court has established four factors for the court to consider in making this determination:
 The factors to be considered in deciding whether it would be in Kezia's best interest to permit further time for a relationship with her father to develop include (1) the length of stay with her foster parents, (2) the nature of her relationship to her foster parents, (3) the degree of contact maintained with the natural parent, and (4) the nature of her relationship to her natural parent. In addition, the genetic bond shared by a biological parent and his or her child, although not determinative of the issue of the best interest of the child is certainly a factor to consider.
CT Page 3636
In re Kezia M., supra, 33 Conn. App. 22.
Both children have resided with the foster parents for two years and both have attained emotional security. Sudol testified that both children see the foster parents as their psychological parents, whom Sudol defined as:
 That parent who has emotionally bonded with the children understands the children's emotional and developmental needs and interacts in a way developmentally appropriate — using discipline, setting limits, expressing bye and fostering emotional and physical development.
Phillips testified that Breanna and Joshua need a permanent home that is capable of understanding and addressing developmental and attachment issues. The foster parents have invested much time, money and effort in seeking out and working with a therapist to better understand the special needs of the children and, in particular, to learn the appropriate parenting techniques to better deal with Breanna's tantrums and disruptive behaviors. As a result of those efforts, both children are now emotionally attached to the foster parents, view them as mother and father and verbally and physically express love and affection for them. The foster parents are committed to being a long term resource for both children. They intend to adopt Joshua and are working on improving Breanna's behavior to such a level that adoption of Breanna would also be sought. In any event, they are committed to keeping the children with them as a family Beaman testified, based on her many observations, that both children are securely attached to their foster parents and respond to their direction and re-direction. She added that the foster parents have provided and continue to provide both children with necessary emotional, spiritual, financial and educational support.
As to the degree of contact the respondent had with his minor children prior to their removal, it was tenuous at best and was characterized by inappropriate snacks, shoving a bottle in their mouths to quiet them and uncontrolled and misdirected inappropriate behavior. The visitation logs and those who have witnessed the respondent's behavior during his visits with the children confirm that the respondent's parenting techniques have not changed. Phillips saw the respondent's parenting style so entrenched that she doubted he would or could change. As stated, any serious attempt to do so now would be "too little, too late."
These two young children suffer from relationship issues as a result of the failure of Louise C. and the respondent to forge a biological bond — parent to child. The respondent argues that the failure of the CT Page 3637 department to provide the respondent with the frequency of visits ordered by the court impacted adversely on his ability to establish or, as he would have it, "reestablish" their parent-child relationship. The inadvertence by the department in curtailing the respondent's visits, however, does not absolve him as he was the primary cause of the lack of a parent-child relationship. No such relationship existed at the time of the neglect petition or at the time of the termination petition nor does it exist at the present time. See In re Shane P., 58 Conn. App. 234, 241
(2000).
This court finds, therefore, by clear and convincing evidence, that the petitioner has proven that there is no on-going parent-child relationship between the respondent and his two minor children and to allow further time to establish such a relationship would be greatly detrimental to the best interests of Breanna and Joshua.
V. DISPOSITION
A. BEST INTERESTS:
Now that the court has found in the adjudication stage that the petitioner has proven each of the statutory grounds alleged by clear and convincing evidence, this court must consider whether termination of the parental rights of the respondent and of Louise C., by virtue of her consent thereto, is in the best interests of their two minor children. The burden remains with the petitioner who must convince the court that termination is, in fact, in the children's best interest. In making its determination as to best interest, the trial court may take into account not only events preceding the filing of the present petition, but may consider all events up to the conclusion of the trial. Practice Book § 33-3. The court is permitted to exercise its discretion based upon a host of considerations. In re Bruce R., 234 Conn. 194, 206 (1995). Each case must be decided on its particular facts and circumstances as it has been held that the determination of whether to terminate parental rights is a highly fact-specific process. See In re Shane P., supra,58 Conn. App. 234. Pursuant to § 17a-112 (d), in making a non-consensual determination of whether to terminate parental rights, the court must consider and make written findings regarding seven factors provided therein. Since Louise C., consented to termination, the statutory findings are not applicable to her best interest determination. Although the court must base a finding that termination is in a child's best interest upon clear and convincing evidence, that standard of proof is not applicable to the seven statutory factors that serve as guidelines and not statutory prerequisites to termination. In re Quanitra M.,60 Conn. App. 96, 104, cert. denied, 255 Conn. 903 (2000). CT Page 3638
B. TERMINATION AS TO RESPONDENT-FATHER
As stated and as amply supported by the evidence, the respondent's tenuous and intermittent contacts with Breanna and Joshua prior to their removal from the care of Louise C. prevented said children from bonding with him and precluded the establishment of any ongoing parent-child relationship. That lack of bonding has been a major factor in the early lives of these children and has resulted in Breanna's reactive attachment disorder and in Joshua's withdrawal. The respondent refuses to acknowledge the disastrous effect that his violent, drunken, on and off relationship with Louise C. had on the development of his children. Despite major participation in parenting programs, the respondent has repeatedly refused to apply what he may have learned in parenting his children. He has consistently demonstrated his poor parenting style before department workers and a court commissioned evaluator. The respondent refuses to alter his long-standing and ill-advised parenting style and refuses to attend to his mental deficiencies and commit to a sustained program of substance abuse aftercare and psychotherapy.
This court has no doubt that the respondent loves his minor children and is concerned for their welfare, however, what the respondent gives or attempts to give said children is the antithesis of what they need. Breanna needs to calm down and to exhibit self-control, but he respondent's interaction simply, as Phillips put it, "revs her up!" Joshua needs to interact a "A engage in playful activities with others, but respondent virtually ignores him. The respondent's behavior has continually undermined the dedicated work of the foster parents and Sudol with the children. One year after her initial evaluation of Breanna and Joshua, Phillips found both children to be "more settled and happier" than during their previous visit with the evaluator and concluded that, as of April, 2000, both children were adjusting well to their foster home.
Sudol testified that any moving of the children would be detrimental their needs and would destroy the emotional security that the children had achieved with the foster parents. Sudol and Phillips stated that visitation with the respondent was confusing, provided the occasion for disruptive behavior and negated the discipline of the foster parents. Both recommended cessation of the visits. Beaman observed that, when not visiting with the respondent or post respondent's visits, both children were smiling and happy, comfortable and calm with their foster parents. As noted, this court suspended visitation pending this decision.
Breanna is now in kindergarten while Joshua is attending preschool, having completed the Birth to Three program. Both children have bonded with their foster parents and perceive them as their psychological mother CT Page 3639 and father. The hard work of the foster parents with Sudol has succeeded in Joshua's emergence from his shell and improvement of Breanna's behavior to some extent. The children have a strong attachment to each other and Phillips highly recommends that they stay together. The children, having been in foster care in excess of two years, are in need of permanence. Their best interest and state and federal public policy demands permanency.
As for Joshua, the foster parents are ready and willing to adopt said child, awaiting this court's decision in the hope that adoption may be realized. As for Breanna, foster mother testified that the foster parents will be a "long term source" for her, however, as of the trial, were not yet committed to adoption. The foster parents had continuing concerns with regard to Breanna's tantruming and disruptive behaviors, however, the foster mother carried the hope and belief that cessation of visitation with respondent would result in more acceptable behavior by Breanna. The foster mother will continue to assess and reassess the prospect of adoption. The respondent argues that the uncertainty over whether to pursue an adoption of Breanna, assuming the termination petition is granted, should cause this court to deny the petition as to said child and, given the bond between her and her brother, should cause this court to deny the petition as to Joshua. The respondent, in that event, would re-engage parenting classes and seriously pursue other services for his mental health and substance abuse needs. The respondent, therefore, asserts that termination of his rights relative to Breanna cannot be in her best interest unless the purpose is to free her to be adopted by the foster parents and that termination relative to Joshua cannot be in his best interest unless the plan is the adoption of both children by the foster parents.
In the case of In re Eden F., supra, 250 Conn. 709, our Supreme Court acknowledges that adoption is the preferred goal of a termination petition filed against both parents, yet points out that it provides only one option for the achievement of stability for a child. The court upheld the ruling of the trial court which found termination to be in the child's best interest even though the foster parents were hesitant about committing to adoption of the child, noting that said foster parents had indicated a willingness to provide the child with a permanent home. Id. The court found that the possibility of a permanent placement with the foster family was the preferable alternative. This court finds that the demonstrated parental care administered by the current foster parents for the past two years to Breanna and Joshua exceeded by leaps and bounds the care administered by the respondent at any time in the lives of these two children. This court finds credible the testimony of foster mother that she and her husband are a long term source for both children. It is clearly and convincingly in the best interest of these children that all CT Page 3640 connections with "Joe-daddy" be severed so that the nurturing, comforting, loving and caring relationship said children currently enjoy with the foster parents may fully develop to its ultimate permanent potential unfettered by disrupting and confusing outside influences.
C. THE STATUTORY FACTORS (As to Respondent)
This court has considered, in making its determination as to whether termination of the respondent's parental rights is in the best interest of Breanna and Joshua, the following statutory factors:
(1) The timeliness, nature and extent of services offered:
Appropriate and timely services were provided by the department including case management services, supervisors for visitation, substance abuse evaluations and programs, mental health and psychological evaluations and a neuro-psychiatric evaluation. Although the respondent attended numerous parenting classes, he failed to alter or to recognize the need to alter his inappropriate parenting style. Despite court ordered steps which required that the respondent participate and cooperate in mental health therapy he denied that he had any mental health issues, did not engage a therapist until well after the filing of the present petition, and despite thirteen sessions, persisted in his denial. The respondent must first deal with and resolve his mental heath issues if he is to pursue a successful aftercare program for his alcohol abuse.
(2) Reasonable efforts to reunite:
Such efforts are mandated by the Federal Adoption Assistance and Child Welfare Act of 1980, 42 U.S.C. § 670 et seq., and Connecticut's termination statute, § Sec. 17a-112 (c)(1). This court earlier found that such efforts were made by the department consistent with the statutory mandates and were not violative of the Americans with Disabilities Act.
(3) Fulfillment of court-ordered obligations:
The respondent participated in parenting classes and substance abuse treatment and was, for the most part, cooperative with the department as mandated by the specific steps ordered by this court. The respondent did not participate in counseling with a treating psychiatrist, delayed any engagement in individual counseling and then denied any need for mental health counseling. The respondent did not, at any time, since the issuance of the steps, demonstrate proper parenting skills. CT Page 3641
As discussed earlier herein, the department did not fully comply with the court-ordered visitation by curtailing the same without modification of said order. This court has found the department's action was unintentional and was an inadvertent oversight which was appropriately corrected once discovered.
 (4) The feelings and emotional ties between the children and the respondent and the children and foster parents:
Father's tenuous and intermittent relationship with these children precluded the establishment of any meaningful child-parent relationship. Neither Breanna or Joshua see the respondent as their father, but as an entertaining, permissive playmate with whom, from Breanna's perspective, "anything goes." He lacks the ability to interact with and engage Joshua and his visits have, in the view of this court, frustrated and side-tracked the growth and development of these children. Neither child has any memory of life with "Joe-daddy" prior to the filing of the neglect petition in August, 1998. Neither of the children look to the respondent for comfort, nurturing and direction. Any feelings and emotional ties which these children have for the respondent are based upon fun, snacks and uncontrolled behavior. There is no parent-child relationship to be preserved.
Over the past two years, the foster parents have been the sole caretakers for Breanna and Joshua. They are perceived by both children as "mother" and "father", have worked hard in identifying and dealing with the children's special needs and are deserving of that perception. They intend to adopt Joshua and hope to adopt Breanna if her tantrums and disrupting behavior subside. In any event, they are a long term source for both children. Breanna and Joshua look to their foster parents for nurturing, comfort, safety, guidance and love and have bonded with them.
(5) The ages of the children:
Breanna is currently five and one-half and Joshua is nearly four and one-half years of age. Both children have been in foster care since August, 1998, and have resided with their current foster parents since March, 1999. Federal and state statutory policy envision a permanent home for a child after only twelve months in foster care. These children have been in such care for two years, seven months. Permanency is long overdue.
 (6) Efforts of the respondent to adjust his circumstances, conduct and conditions:
Although the respondent now resides in a house purchased by him in 1999 CT Page 3642 with a large backyard to accommodate his two minor children, such change on his part does not begin to meet the needs of Breanna and Joshua. The respondent needed to adjust his permissive parenting style and to understand and meet the special needs of said children through the use of parenting techniques appropriate to those needs. As the visitation logs and all those who witnessed the respondent's interaction with said children attest, the respondent refused to take direction or constructive criticism from department caseworkers and failed to put into practice any knowledge he may have gained from parenting classes. His inappropriate parenting style caused Breanna's bad behavior to escalate and resulted in Joshua's further withdrawal into himself. The respondent lacked any ability to properly interact with and to appropriately parent these children in August, 1998, when they were removed, in July, 1999, when they were committed and in January, 2000, when the present petition was filed. As previously found herein, he had no on-going parent-child relationship with Breanna or Joshua and has failed to achieve any level of rehabilitation approaching that which is necessary to properly care for said children. Any further attempts to reach that level would be fruitless and not in the best interests of said children.
(7) Prevention of meaningful relationship by others:
This court finds that neither economic circumstances nor the unreasonable act of any person, including department personnel, prevented the respondent from maintaining a meaningful relationship with Breanna or Joshua. The fact is that the respondent's sporadic contact with his two minor children prior to their removal by the department precluded a biological bond and negated the establishment of any parent-child relationship.
D. TERMINATION AS TO LOUISE C. — MOTHER
Even though Louise C. has voluntarily consented to the termination of her parental rights to Breanna and Joshua, this court may not terminate said rights unless and until it finds, by clear and convincing evidence, that it is in each of the children's best interest to do so. § 17a-112
(b).
Records of the department filed with this court reveal that Breanna and Joshua, along with three other children of Louise C., were removed in August, 1998, as mother, due to her alcohol and drug abuse, was unable to care for her children. The children were noted in the social study to be "dirty, unfed, and frightened." Despite numerous referrals by the department, both outpatient and inpatient, mother was unable to overcome her abuse of alcohol and her use of cocaine. After completing a thirty day inpatient program at Carnes-Week in Torrington in October, 1998, she CT Page 3643 refused to follow the recommended aftercare regimen with the resultant relapse. She refused to engage in individual therapy and failed to complete domestic violence group therapy and parenting classes. Her lack of follow through and her continued use of alcohol and drugs present a substantial risk to Breanna and Joshua. Any continuance of a relationship between mother and said children would be detrimental to their best interest.
VI. CONCLUSION
This court finds, by clear and convincing evidence, that termination of the parental rights of both parents of Breanna and Joshua is in their best interest. Both children have been in their current foster home for two years. The foster parents provide the loving and nurturing care and the appropriate discipline that the children require. The foster parents have made a commitment to be a long-term source for both children, intending to adopt Joshua and hoping to adopt Breanna. They possess and have improved upon the skills required to deal with Breanna's tantrums and with Joshua's withdrawal. Both children have bonded with the foster parents and are happy and content. Both are entitled to a permanent home without further delay.
VII. ORDERS
Based on the foregoing, it is:
ORDERED that the parental rights of Louise C., her consent having been accepted by this court on May 24, 2000, and of Joseph P. because of his failure to achieve that degree of rehabilitation referred to in §17a-112 (c) and because of the lack of an on-going parent-child relationship, be and are hereby terminated with respect to their two minor children, to wit, Breanna R. and Joshua R.
ORDERED that the commissioner of the department of children and families is hereby appointed statutory parent who shall submit to this court within thirty days of the date of filing of this memorandum a written report as to permanency.
ORDERED that if adoption of each child is not finalized within one year from the date this memorandum is filed, said commissioner shall submit a motion for review with respect to each child no later than February 6, 2002, to be docketed and heard no later than one year following submission of the thirty day report.[11]
Wilson J. Trombley, Judge CT Page 3644